IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MUNICIPAL PARKING SERVICES, INC. )<br><br>*Plaintiff,* )<br><br>v. )<br><br>PARKING REVENUE RECOVERY<br>SERVICES, INC., LAZ KARP ASSOCIATES,<br>LLC and LAZ PARKING TEXAS, LLC, )<br><br>*Defendants.* | Civil Action No.<br>JURY DEMAND |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Municipal Parking Services, Inc. ("MPS") brings this action against Defendant Parking Revenue Recovery Services, Inc. ("PRRS"), and Defendants LAZ Karp Associates, LLC and LAZ Parking Texas, LLC, and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for patent infringement of U.S. Patent No. 12,688,734 (Exhibit 1), (the "'734 patent").

2. Plaintiff MPS develops and sells innovative automated parking technology platforms that are now deployed in parking facilities and on streets across North America. The '734 patent was awarded to MPS to protect these revolutionary parking technology platforms.

3. Upon information and belief, Defendants are engaged in making, using, offering for sale, selling, importing, or otherwise providing, within the United States and in particular the State of Texas and this District, automated parking monitoring and management systems/services and in so doing are infringing, directly or indirectly, claims of the '734 patent, and Defendants continue to do so willfully and without authorization.

4.      MPS seeks to recover damages, attorney's fees, and costs arising from Defendants' infringement of MPS's patented technology. MPS also seeks an injunction against further infringement by Defendants.

## THE PARTIES

5.      Plaintiff MPS is a Minnesota corporation having a place of business at 11305 Four Points Dr., Building 2, Suite 300, Austin, Texas.

6.      MPS is the owner of the '734 patent.

7.      MPS develops, markets, and sells innovative parking solutions that are deployed by cities, municipalities, and private parking facility operators.

8.      Upon information and belief, Defendant PRRS is a Colorado corporation with a principal place of business located at 6025 S. Quebec St., Suite 350, Greenwood Village, CO.[1]

9.      Upon information and belief, PRRS also has and maintains regular and established places of business in this District, including in the city of Austin, Texas.

10.      Upon information and belief, PRRS may be served with process by serving its registered agent, Incorp Services, Inc., 815 Brazos Street, Ste. 500, Austin, Texas 78701.[2]

---

[1] https://www.sos.state.co.us/biz/BusinessEntityDetail.do?quitButtonDestination=BusinessEntity Results&nameTyp=ENT&masterFileId=20051367126&entityId2=20051367126&fileId=200513 67126&srchTyp=ENTITY

[2] https://comptroller.texas.gov/taxes/franchise/account-status/search/32059110927

2

11.     Upon information and belief, Defendant LAZ Karp Associates, LLC is an entity organized under the laws of Connecticut with a principal place of business at 1 Financial Plaza, Floor 14, Hartford, Connecticut 06103.[3]

12.     Upon information and belief, LAZ Karp Associates, LLC also has and maintains a regular and established place of business in this District, including at 515 Congress Ave, Suite 2240, Austin, Texas 78701.[4]

13.     Upon information and belief, LAZ Karp Associates, LLC may be served through its registered agent located at Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.[5]

14.     Upon information and belief, Defendant LAZ Parking Texas, LLC is a limited liability company organized under the laws of Texas with a principal place of business at 1 Financial Plaza, Floor 14, Hartford, Connecticut 06103.[6]

15.     Upon information and belief, LAZ Parking Texas, LLC has and maintains a regular and established place of business in this District, including at 515 Congress Ave, Suite 2240, Austin, Texas 78701.[7]

16.     Upon information and belief, LAZ Parking Texas, LLC may be served through its registered agent located at Corporation Service Company, 211 East 7th Street, Suite 620, Austin,

---

[3] https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=VMAbtbSIIFcQ27XZvUQUhIrXWnty42s5koArywX5H1w%3D

[4] https://www.lazparking.com/our-company/about/contact-us#ntx

[5] https://comptroller.texas.gov/taxes/franchise/account-status/search/12611647087

[6] https://comptroller.texas.gov/taxes/franchise/account-status/search/32018123284

[7] https://www.lazparking.com/our-company/about/contact-us#ntx

Texas 78701.[8]

17.    Upon information and belief, LAZ Parking Texas, LLC is wholly owned by, and/or acts as the agent of, and/or is dominated, controlled and directed by, and/or acts as a mere instrumentality of, LAZ Karp Associates, LLC. For example, LAZ Parking Texas, LLC lists a principal place of business located at the same address as LAZ Karp Associates, LLC (1 Financial Plaza, Floor 14, Hartford, Connecticut);[9] Alan Lazowski is listed as the CEO and Director LAZ Parking Texas,[10] is the only listed principal of LAZ Karp Partners,[11] LLC, which is in turn, one of three principles of LAZ Karp Associates, LLC[12], and is named as the "Key Principal" of Laz Karp Associates, LLC by Dun & Bradstreet;[13] and LAZ Parking's business website also lists Mr. Lazowski as Chairman and CEO of LAZ Parking. LAZ Karp Associates, LLC and LAZ Parking Texas, LLC are referred to collectively hereinafter as "LAZ Parking".

18.    Upon information and belief, LAZ Parking owns, controls, and/or operates parking lots throughout the United States and has contracted with PRRS for PRRS's "ARC" automated parking monitoring and management systems/services at parking facilities LAZ Parking operates, including facilities in this District and specifically in Austin, Texas.

---

[8] https://comptroller.texas.gov/taxes/franchise/account-status/search/32018123284

[9] https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=8OlpzHEHTCfdR%2BtvToZu%2BXToWSFv0GEYjLuZpsnbNy0%3D

[10] https://comptroller.texas.gov/taxes/franchise/account-status/search/32018123284

[11] https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=KJbzm7DNP86n3yhc5PuFpkBTfHh6TB4RVClxjQoSWj5dejQ6TjLpGPQexkv7GCf3

[12] https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=8OhkLOe59UkQS%2BdiYWX49%2BLMPQk37DZkSHpJmwq6M3gLzyLMyohOLaVm4%2BIkiC2%2F

[13] https://www.dnb.com/business-directory/company-profiles.laz_karp_associates_llc.5b4e676daa15bdc73b97d571813f201d.html

## JURISDICTION AND VENUE

19.     This action arises under the Patent Act, 35 U.S.C. § 271 et seq.

20.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

21.     Jurisdiction and venue for this action are proper in this District.

22.     As discussed in greater detail below, Defendants have individually and/or jointly, committed acts of patent infringement and/or induced and/or contributed to acts of patent infringement by others in this District, the State of Texas, and elsewhere in the United States, and continue to do so willfully and without authorization by making, selling, using and/or inducing others to use or contributing to others' use of automated parking monitoring and management systems/services that infringe claims of the '734 patent and/or have no substantial non-infringing use.

23.     This Court has personal jurisdiction over Defendant PRRS at least because, through PRRS's own acts and/or through the acts of each other Defendant or customer acting as its agent, representative, or alter ego, PRRS (i) has a presence or regular and established place of business in the State of Texas and this District; (ii) has purposefully availed itself to the privileges of conducting business in the State of Texas and this District; (iii) has done and is doing substantial business in the State of Texas and this District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including committing (directly or indirectly) one or more acts of infringement in the State of Texas and this District; (iv) maintains continuous and systematic business contacts in the State of Texas and this District; and/or (v) provides automated parking monitoring and management systems/services alleged to be infringing in this Complaint, directly or through intermediaries, with awareness that such systems/services are likely destined for use, offer for

sale, and/or use in the State of Texas and in this District.

24. Upon information and belief, PRRS is registered to do business in Texas with the Texas Comptroller of Public Accounts.[14] Upon information and belief, PRRS may be served with process by serving its registered agent, Incorp Services, Inc., located in this District at 815 Brazos Street, Ste. 500, Austin, TX 78701.[15]

25. Upon information and belief, PRRS does regularly and continuously do business in Texas and in this District.

26. Upon information and belief, PRRS maintains regular and established places of business in this District, including in the cities of Austin, Texas and San Antonio, Texas.

27. For example, upon information and belief PRRS installs and operates parking monitoring equipment at parking facilities in at least Austin, Texas and San Antonio, Texas and issues parking violation notices to individuals using such parking facilities. See, for example, Exhibit 2 (post titled "Prrs (parking revenue recovery services) scam", with message including "Parked in a LAZ lot and I got the dreaded notice of 'non' compliance" from "r/Austin" post); Exhibit 3 (PRRS "ticket" in San Antonio).

28. For example, upon information and belief PRRS installs and operates parking monitoring equipment, including but not limited to permanently installed parking cameras, at fixed locations within parking facilities in Austin, Texas, including but not limited to facilities located at:

- 510 Guadalupe Street, Austin, Texas
- 108 W. Gibson, Austin, Texas
- 305 S. Congress Avenue, Austin, Texas

---

[14] https://comptroller.texas.gov/taxes/franchise/account-status/search/32059110927

[15] https://comptroller.texas.gov/taxes/franchise/account-status/search/32059110927

- 415 E 7th Street, Austin, Texas
- 99 Trinity Street, Austin, Texas

29. For example, John Conway, on information and belief PRRS's co-founder, has stated that PRRS is "installing the system" at parking facilities of its customers.[16]

30. For example, PRRS has installed its own signs at parking facilities in this District bearing PRRS's own name and purporting to establish terms and conditions of a contract between PRRS and those who park at that facility.

31. Images of PRRS's sign installed at parking facilities located at 305 South Congress Avenue, Austin, Texas; 415 East 7th Street, Austin, Texas; and 920 South Santa Fe Street, El Paso, Texas are attached to this Complaint at Exhibit 4.

32. Upon information and belief, PRRS also issues parking violation notices associated with the locations identified in paragraph 28.

33. For example, PRRS issued a parking violation notice associated with 510 Guadalupe Street, Austin, Texas. Exhibit 5 ("Parking Notice" by PRRS for violation at parking facility located at 510 Guadalupe Street, Austin, Texas, on 4/27/2024).

34. Upon information and belief, PRRS also maintains employees located in this District.

35. For example, Indeed.com displays posted employee reviews from individuals identified as located in "San Antonio, TX," "El Paso, TX," and "Austin, TX".[17]

36. Upon information and belief, PRRS's employees located in this District conduct PRRS's business in person and at physical parking facilities in this District.

---

[16] https://www.facebook.com/Parkingprrs/videos/768476596907647, at 1:00.

[17] https://www.indeed.com/cmp/Parking-Revenue-Recovery-Services/reviews

7

37.     Upon information and belief, PRRS employees perform activities central to PRRS's business at physical parking facilities of PRRS's customers in this District.

38.     At least in view of the foregoing and upon information and belief, the presence of PRRS's employees in this District is important to and connected to such employees' performance of their professional responsibilities and duties in this District, and to PRRS's business in this District.

39.     Upon information and belief, PRRS has also purposefully directed its activities at residents in this District by specifically advertising, promoting, offering for sale, selling and/or distributing and continues to advertise, promote, offer for sale, sell, and/or distribute its automated parking monitoring and management systems/services used to infringe the '734 patent to customers and potential customers in this District.

40.     For example, upon information and belief PRRS has provided and continues to willfully provide infringing automated parking monitoring and management systems/services at parking lots and/or facilities in this District, including via infringing use of its "Automated Recognition and Compliance System" ("ARC") at facilities in the city of Austin, Texas located at least at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 415 E 7th Street, and 99 Trinity Street as explained above and further alleged below and in the attached Exhibit 6, and PRRS has derived substantial revenues from such infringement occurring within Texas and this District.

41.     The patent infringement claim alleged herein arise out of or is related to one or more of the foregoing activities. As explained above and further in the specific allegations below, on information and belief a substantial part of the events giving rise to MPS's claim against PRRS have occurred in Texas and this District.

42. Moreover, Plaintiff MPS is a competitor of PRRS. MPS has an office and established place of business in the State of Texas and specifically in Austin, Texas in this District, and MPS's customers and potential customers reside in the State of Texas (including in this District). Therefore, PRRS's infringing acts giving rise to this lawsuit and the harm MPS has suffered have both occurred in this District.

43. Defendant PRRS has established sufficient minimum contacts with the State of Texas and this District such that PRRS should reasonably and fairly anticipate being brought into court in the State of Texas and this District without offending traditional notions of fair play and substantial justice.

44. Venue is proper in this District as to PRRS under 28 U.S.C. §§ 1391(b) and 1400(b).

45. Venue is proper as to PRRS because, on information and belief, PRRS has committed acts of infringement in this District, and PRRS also has a regular and established place of business in this District.

46. Upon information and belief, as explained above and also as alleged further below and in attached Exhibit 6, PRRS has committed and continues to commit acts of infringement in this District, by using (individually and/or jointly with LAZ Parking or other customers) and/or inducing others to use, or contributing to others' use of, automated parking monitoring and management systems/services, including PRRS's "ARC" system/services provided at parking facilities located in this District, including at facilities located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 415 E 7th Street, and 99 Trinity Street in Austin, Texas.

47. Upon information and belief, and also as explained above in paragraphs 26 through 45, PRRS also has a regular and established place of business in this District. Further,

9

upon information and belief and also as explained in paragraphs 21 through 46 above, PRRS's business at its established locations in this District relate to the infringing use of PRRS's "ARC" automated parking monitoring and management systems/services.

48.     This Court has personal jurisdiction over LAZ Parking, at least because LAZ Parking (i) has a presence or regular and established place of business in the State of Texas and this District; (ii) has purposefully availed itself to the privileges of conducting business in the State of Texas and this District; (iii) has done and is doing substantial business in the State of Texas and this District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including committing (directly or indirectly) one or more acts of infringement in the State of Texas and this District; and/or (iv) maintains continuous and systematic business contacts in the State of Texas and this District.

49.     Upon information and belief, LAZ Parking Texas LLC and LAZ Karp Associates, LLC are registered to do business in Texas with the Texas Comptroller of Public Accounts, and each of LAZ Parking Texas and LAZ Karp Associates, LLC may be served with process by serving their registered agent in Texas at Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.[18]

50.     Upon information and belief, LAZ Parking does regularly and continuously do business in Texas and in this District.

51.     Upon information and belief, LAZ Parking maintains regular and established places of business in this District and generates substantial revenues from its business activities in this District.

---

[18] https://comptroller.texas.gov/taxes/franchise/account-status/search/32018123284
https://comptroller.texas.gov/taxes/franchise/account-status/search/12611647087

52.    For example, upon information and belief, LAZ Parking maintains a physical office and employees in this District, including at 515 Congress Ave., Suite 2240, Austin, TX. See, for example, https://www.lazparking.com/our-company/about/contact-us#ntx:



53.    As other examples, upon information and belief, LAZ Parking also maintains regular and established places of business at parking facilities in Texas and in this District that it operates, including monitoring and managing entry and exit to such parking facilities.

54.    LAZ Parking's website shows 61 different parking facilities available in Austin, Texas:

11



https://go.lazparking.com/search-results/Austin-Texas-US?start=2025-04-08T22%3A23%3A10.121Z&end=2025-04-09T00%3A23%3A10.121Z

55.     Upon information and belief, LAZ Parking also maintains ownership, management, and/or control over the parking facilities shown in the preceding paragraph, including but not limited to the means of entry and exit at such facilities.

56.     In addition, upon information and belief LAZ Parking has contracted with PRRS for PRRS to provide PRRS's automated parking monitoring and management systems/services, including PRRS's ARC system/services, at parking facilities owned, operated, managed, and/or controlled by LAZ Parking, including such facilities located in this District, the use of which systems/services infringes the '734 patent as alleged in this Complaint.

57.     Upon information and belief, LAZ Parking operates parking facilities located in Austin, Texas at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Ave, 415 E 7th Street, and 99 Trinity Street in Austin, Texas.

58.     Below are true and correct screen captures from LAZ Parking's website for

parking facilities operated by LAZ Parking located at 510 Guadalupe Street and 108 W. Gibson in Austin, Texas:

| 510 Guadalupe, Austin, TX | 108 W. Gibson, Austin, TX |
|---|---|
|  | |
| https://go.lazparking.com/buynow?l=750&start=2025-04-08T22%3A46%3A23.310Z&end=2025-04-09T00%3A46%3A23.310Z | https://go.lazparking.com/buynow?l=138983&start=2025-06-06T16%3A30%3A30.938Z&end=2025-06-06T18%3A30%3A30.938Z |

59. Upon information and belief, parking facilities where LAZ Parking has contracted for the infringing use of PRRS's automated parking monitoring and management systems/services include but are not limited to those located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Ave, 415 E 7th Street, and 99 Trinity Street in Austin, Texas.

60. Exhibit 5 is a true and correct copy of a screen capture of a reddit.com post regarding "Parking Notice" from "Parking Revenue Recovery Services, Inc," for a parking facility identified as located at 510 Guadalupe Street, Austin, Texas, on 4/27/2024.

61. Upon information and belief, LAZ Parking Texas LLC also owns 510 Guadalupe Street, Austin, Texas. Exhibit 7.

62. Exhibit 7 is a true and correct copy of a property search record for 510 Guadalupe Street, Austin, Texas, from the website record of the Travis Central Appraisal District of Travis County, Texas, available at https://travis.prodigycad.com/property-detail/848897/2025.

63. Upon information and belief, by knowingly contracting for and/or using PRRS's

automated parking monitoring and management systems/services at parking facilities owned, operated, managed, and/or controlled by LAZ Parking in the State of Texas and this District, LAZ Parking has committed acts of infringement in the State of Texas and in this District, directly or indirectly, as explained above and further herein below.

64.    The patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities. As explained above and further in the specific allegations below, on information and belief a substantial part of the events giving rise to MPS's claim against LAZ Parking have occurred in the State of Texas and this District.

65.    LAZ Parking has established sufficient minimum contacts with the State of Texas and this District such that LAZ Parking should reasonably and fairly anticipate being brought into court in the State of Texas and this District without offending traditional notions of fair play and substantial justice.

66.    Venue is proper in this District as to LAZ Parking under 28 U.S.C. §§ 1391(b) and 1400(b).

67.    Venue is proper as to LAZ Parking because, on information and belief, LAZ Parking has committed acts of infringement in this District, and LAZ Parking also has a regular and established place of business in this district.

68.    Upon information and belief, as explained above and also as alleged further below and in attached Exhibit 6, LAZ Parking has committed and continues to commit acts of infringement in this District, including by using and/or inducing others to use infringing automated parking monitoring and management systems/services, including PRRS's "ARC" systems/services, at parking facilities located in this District, including at facilities located in Austin, Texas at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue,  415 E 7th

14

Street, and 99 Trinity Street.

69.     Upon information and belief, and as explained above in paragraphs 49 through 67, LAZ Parking also has regular and established places of business in this District. Further, upon information and belief and also as explained in paragraphs 48 through 68 above, LAZ Parking's business at its established locations in this District relate to the infringing use of PRRS's automated parking monitoring and management system/services.

## JOINDER

70.     MPS seeks the relief requested herein, including an injunction and appropriate damages, against PRRS itself based on PRRS's activities related to PRRS's provision of infringing automated parking management and monitoring systems/services activities to its customers, including but not limited to provision of such systems/services to PRRS customer LAZ Parking.

71.     As to the activities of LAZ Parking specifically, MPS seeks the relief requested herein against each of PRRS and LAZ Parking jointly, severally, or in the alternative, arising out of the same infringing use of the same PRRS system/services at LAZ Parking locations.

72.     Joinder of PRRS customer LAZ Parking to this action is proper under at least Federal Rule of Civil Procedure 20 and 35 U.S.C. § 299, at least because the infringing conduct of each Defendant that is alleged by this Complaint arises out of the same transaction, occurrence, or series of transactions or occurrences, relating to using the same system(s)/service(s) to perform the same accused method, and questions of fact common to all Defendants will arise in this action.

73.     For example, upon information and belief, PRRS makes, uses, offers for sale, and/or sells automated parking monitoring and management systems/services for or to its

customers including joined defendants LAZ Parking, and in doing so infringes claims of the '734 patent.

74.    Also, upon information and belief, LAZ Parking uses and/or induces others to use automated parking monitoring and management systems/services purchased and/or licensed from PRRS, and in doing so infringes, directly and/or indirectly, claims of the '734 patent. Upon information and belief, because PRRS's automated parking monitoring and management systems/services have been used and are in use at LAZ Parking facilities, there are sales, licensing and/or technology agreements between LAZ Parking and PRRS.

75.    At least in view of the facts alleged in paragraphs 70 through 74 above and because infringement allegations as to each Defendant concern use of the same automated parking monitoring and management systems/services provided by PRRS, questions of fact common to all Defendants will arise in this action.

## BACKGROUND AND '734 PATENT

76.    Since its inception, Plaintiff MPS has become a pioneering force in the smart parking industry. As MPS has grown, it has expanded operations across the United States including in Austin, Texas.

77.    MPS provides municipalities and the public with smart parking technology to help keep cities and campuses safer:



https://municipalparkingservices.com/.

78.     MPS has successfully designed, developed, patented, and deployed innovative technology that provides its customers with automated, cost-effective parking lot monitoring and management solutions.

79.     More specifically, MPS's patented technology includes automated processes and systems that capture the identity information of vehicles entering and exiting parking lots, calculate associated fees, and issue parking violation notices where appropriate.

80.     MPS's solutions allow automated maintenance of parking lots via sophisticated camera usage and cloud-based servers. An example is below:





81.     Customers of MPS's patented automated parking solutions include public municipalities and private parking facility operators.

82.     MPS has invested substantial resources to develop and patent its automated parking technology. As a result, MPS has been awarded various patents protecting its

innovations, including the '734 patent.

83.    The '734 patent relates to, among other things, novel methods to monitor parking facilities and enforce violations.

84.    MPS is the owner of the entire right, title, and interest in and to the '734 patent, which duly and legally issued on July 21, 2026. The '734 patent is entitled "Parking meter system." A copy of the '734 patent is attached as Exhibit 1.

85.    The claims of the '734 patent carry a presumption of validity under 35 U.S.C. § 282(a) and are enforceable.

**THE '734 PATENT CLAIMS SIGNIFICANT TECHNOLOGICAL ADVANCEMENTS IN PARKING INDUSTRY TECHNOLOGY**

86.    The '734 patent provides novel and counterintuitive technical solutions to specific parking industry problems of monitoring and managing parking facilities in a cost-effective manner, while improving enforcement (and parking compliance) and increasing revenues.

87.    As of the priority date of the patent and later, the methods of monitoring and managing parking in a parking facility claimed by the '734 patent contained inventive concepts that improved on existing parking industry technology and were not well-understood, routine, or conventional activity.

88.    For example, claim 1 comprises a method that allows gateless parking facility management and remote enforcement and includes a novel combination of capturing image data of a vehicle entering a parking facility, capturing image data of a vehicle exiting a parking facility, recording vehicle entry and exit times, transmitting the image data to a remote networked computer system, determining an identification of the vehicle based on the captured image data, automatically determining whether a parking violation has occurred, and automatically generating a parking violation that includes the vehicle's license plate number,

18

time of entry, and an image of the vehicle. This method was not conventional in the parking industry as of the priority date of the patent.

89.     The invention of the asserted claim of the '734 patent provides many advantages over conventional parking industry monitoring and enforcement technology and provides specific solutions to technical problems in the parking industry.

90.     Attached as Exhibit 8 is a true and correct copy of declaration testimony from parking industry expert Saad Bedros, Ph.D., with the accompanying Exhibit A, that is in the reexamination file for U.S. Patent No. 11,257,302 (the "'302 patent"), a parent patent to the '734 patent which includes many claim elements that overlap with claim elements of the '734 patent.

91.     Declaration testimony from Dr. Bedros in reexamination files for several of the parent patents of the '734 patent states that one of the patents' inventive concepts is the use of automated, intelligent monitoring for reliable, 24/7 enforcement of parking rules. "This increases compliance and captures incremental revenue while saving property owners significant capital investment, maintenance, and employee costs due to reduced personnel and equipment." *E.g.*, Exhibit 8, ¶10.

92.      Declaration testimony from Dr. Bedros also states that "[i]ssuing parking violation notices traditionally requires a human parking enforcement person to draft the parking citation and place a physical notice of the violation (a parking ticket) on the violating vehicle. Doing this is labor intensive because it requires a person to actively monitor the parking lot and manually issue the violation notices. The parking enforcement person cannot catch all violations because they cannot be everywhere at once for all hours of the day and every day of the year. Thus, the traditional process for issuing parking violations notices requires the cost of employing personnel to issue violation notices and only a fraction of the violations will be captured. The

invention of the '302 patent significantly improves on this traditional issuance of violation notices by providing for the automatic issuance of violation notices by computer systems to the vehicle's owner for all violations that occur in the parking lot. The result is that revenue is increased while overhead is decreased." *E.g.*, Exhibit 8, ¶11.

93.     The specification states that "[t]he parking management technology herein is directed to parking lots, ramps and streets for monitored parking use and for ticketing as required by system software logic without the need for on-premises attendant personnel. The invention can be used, for example, for unattended lots, ramps and street situations." Exhibit 1, 2:30-35.

94.     The specification states that "[t]he lot monitoring embodiments discussed herein eliminate the cost of lot monitoring personnel and also automatically capture all violators. Thus revenue is enhanced." Exhibit 1, 2:35-38.

## A.     Examples of Specific Technical Advances and Advantages

95.     The '734 patent explains that the claimed methods allow for remote/offsite management and enforcement of the rules of parking facilities.

96.     By  requiring novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmitting the image data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility, determining whether a parking violation has occurred, and automatically generating violation notices populated with information such as vehicle license plate characters, time of entry, and an image of the vehicle, the claimed methods provided a technical solution for remote/offsite management and enforcement of the rules of parking facilities.

97. The '734 patent states that the invention "eliminate[s] the cost of lot monitoring personnel and also automatically capture all violators" and therefore "revenue is enhanced." Exhibit 1, 2:36-38.

98. The '734 patent also states that "[t]he present invention in certain embodiments increases revenue compared to traditional manual parking meters and manual parking enforcement methods" and that "[c]ertain embodiments of the invention can be configured to . . . auto enforce any violation without the need for an officer's presence." Exhibit 1, 3:34-44.

99. The '734 patent also states that "[c]ertain embodiments can perform license plate recognition (LPR) and transmit the jpg and the ASCII data to a remotely-located networked site for query to the respective department of motor vehicles, issuance of a citation through the mail and fine collections." Exhibit 1, 3:48-52.

100. The '734 patent states that its invention allows parking that is "all centrally managed and remotely distributed by the city parking department, police or other designated agency." Exhibit 1, 4:5-6.

101. The '734 patent also states that with its invention "the operations of all meters in a given system can be monitored and remotely controlled via a central operator." Exhibit 1, 7:27-29.

102. At the time of invention of the '734 patent, it was counterintuitive and unconventional to improve parking facility management and revenue by providing monitoring and enforcement off-site rather than increasing the conventional on-site monitoring and enforcement.

103. The '734 patent explains that the claimed methods allow for gateless parking lots while actually improving enforcement and increasing revenue.

21

104. Conventionally, gates were used to restrict unauthorized ingress or egress to and from parking facilities, but gates were also known to cause problems and delays when multiple cars attempted to enter or exit the facility at the same time, for example, after a large venue event.

105. The claimed techniques, including novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmitting the image data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility, determining whether a parking violation has occurred, and automatically generating violation notices populated with information such as vehicle license plate characters, time of entry, and an image of the vehicle, provided a technical solution allowing gateless parking lots while actually improving enforcement and increasing revenue.

106. The '734 patent states that "[a]n advantage of certain embodiments is that electromechanical gates can be eliminated, if desired" and that "[s]uch gates are costly and can fail." Exhibit 1, 25:53-55.

107. The '734 patent describes a "meterless, gateless, unattended parking lot management system." Exhibit 1, 23:34-36.

108. The '734 patent also states that "the invention provides . . . much less hassle to the consumer." Exhibit 1, 24:29-32.

109. The '734 patent states that the inventions "eliminate the cost of lot monitoring personnel and also automatically capture all violators" and therefore "revenue is enhanced." Exhibit 1, 2:36-38.

110. Declaration testimony from a parking industry expert in reexamination file histories of parent patents to the '734 patent states that "[the shared specification] further teaches

combining touchless payments with remote enforcement removes the need for gates, reducing congestion and enhancing the user experience." *E.g.,* Exhibit 8, ¶12 (Decl. of Saad Bedros, PhD.).

111.   Attached as Exhibit 11 is a true and correct copy of declaration testimony from Joseph Caldwell, CEO and President of MPS, that is in in the reexamination files for the '302 patent, and U.S. Patent No. 11,688,205 (the "'205 patent"), another parent patent to the '734 patent.

112.   Declaration testimony from Mr. Caldwell in the reexamination file history of two parent patents to the '734 patent states that the patented technology, which allows for the deployment of automated, intelligent monitoring for reliable, 24/7 enforcement of parking rules, increases "compliance and the capturing of incremental revenue while saving property owners significant capital investment, maintenance and employee costs due to reduced personnel and equipment costs." Exhibit 11, ¶ 7.

113.   At the time of invention of the '734 patent, it was counterintuitive and unconventional to provide increased revenue and improved parking facility enforcement by a technical solution allowing elimination of physical components like gate arms that conventionally controlled parking facility entry and exit points.

114.   The invention of the '734 patent allows for improved compliance and increased revenue by providing remote monitoring of parking lot entrances and exits, rather than individual spaces.

115.   The Montgomery patent cited during the reexamination of the '302, and '205 patents is an example of conventional parking technology that focused on monitoring individual parking spaces as the means to address "technical problems associated with monitoring and

recording the violations within a parking lot." Exhibit 12, 1:52-54. A true and correct copy of the Montgomery patent is attached as Exhibit 12.

116. Declaration testimony from a parking industry expert in reexamination files for certain parent patents to the '734 patent states that "because there is a camera at the entrance and the exit of a parking lot, the very purpose of inventive concepts as deduced by the claim is that the vehicles in a parking lot do not exit in the same order they entered. This is important because, by its very nature, the sophisticated use of cameras and associated network systems allows for the parking lot owner to manage the 'whole parking lot' without exacting oversight of each individual parking spot. Additionally, the duration of individual parking vehicles can be calculated, which, at the end of the day, is the most important aspect of providing parking lot owners the convenient opportunity to manage the entire property without unnecessary oversight of individual spots." *E.g.,* Exhibit 8, ¶14 (Decl. of Saad Bedros, PhD.).

117. The '734 patent specification explains that the invention provides "a meterless, gateless, unattended parking lot management system." Exhibit 1, 23:34-36.

118. The '734 patent states "[t]he vehicle entrance 504 and exit 506 to the lot are monitored because all vehicles must pass through these limited thresholds. Of course, there can be multiple entry/exit points without departing from the scope of the invention. A plate reader 508 or camera is disposed adjacent (or associated with) each entry point 504 and configured to read the vehicle ID of every vehicle entering the parking lot/ramp/facility 500." Exhibit 1, 22:49-56.

119. The '734 patent states that the invention "provides an unattended, automated parking lot and on street management, with no meters, optionally no kiosk, and much less hassle

24

to the consumer, while fully automating the violation process for parkers who do not pay, or stay beyond what they have paid for." Exhibit 1, 24:29-34.

120.    The '734 patent states "[t]he lot monitoring embodiments discussed herein eliminate the cost of lot monitoring personnel and also automatically capture all violators. Thus revenue is enhanced." Exhibit 1, 2:35-38.

121.    The claimed techniques, including claims requiring novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmission of the image data to a remote networked computer, determining the identification of the vehicle entering and exiting the parking facility, determining whether a parking violation has occurred, and automatically generating violation notices populated with information such as vehicle license plate characters, time of entry, and an image of the vehicle, provide a technical solution for improved enforcement and increased revenue without providing oversight of each parking spot. The asserted independent claim in the '734 patent includes these limitations.

122.    At the time of invention of the '734 patent, it was counterintuitive to provide improved parking facility enforcement and increased revenue by foregoing additional equipment to monitor individual spaces and instead remotely monitoring entry and exit points of the whole parking facility (e.g., the parking lot).

123.    The '734 patent explains that the claimed methods allow for elimination of kiosks at parking facilities and/or for contactless payment, while actually improving customer experience and revenue collection and decreasing cost.

124.    By teaching and claiming novel combinations of capturing entry and exit image data of the vehicle entering and exiting the parking facility, transmitting the image data to a remote networked computer, recording times of entry and exit for the vehicle, determining the

25

identification of the vehicle entering and exiting the parking facility, determining whether a parking violation has occurred, and automatically generating violation notices populated with information such as vehicle license plate characters, time of entry, and an image of the vehicle, the claimed techniques allow for elimination of kiosks at parking facilities and/or for contactless payment. Transmission of the parking data to a remote networked computer system allows the networked system to communicate relevant information with customer cell phones directly via the internet or through other online payment vendors, obviating the need for a payment interface such as a kiosk at the parking facility.

125.   The '734 patent states that the invention enables "an unattended, automated parking lot and on street management, with no meters, optionally no kiosk, and much less hassle to the consumer, while fully automating the violation process for parkers who do not pay, or stay beyond what they have paid for." Exhibit 1, 24:29-34.

126.   The '734 patent states "all transactions could be done without the kiosk 512 and the municipality or lot owner could mail out charges to car owners based upon the LPR technology and systems implementation described herein." Exhibit 1, 26:34-37.

127.   The '734 patent states "[t]he payment acceptor 114 can also be configured to accept contactless payments. . . . A QRS picture can also be displayed on the meter's screen for the user to scan with their phone to submit payment with an appropriate application on their phone enabling such payment method." Exhibit 1, 6:46-56.

128.   The '734 patent states "[t]he lot monitoring embodiments discussed herein eliminate the cost of lot monitoring personnel and also automatically capture all violators. Thus revenue is enhanced." Exhibit 1, 2:35-38.

26

129. Declaration testimony from a parking industry expert in reexamination file histories of parent patents to the '734 patent states that "upon implementing the claimed invention . . . touchless payment options can be provided that enable mobile, app-less payments (via QR. codes and digital wallets), which can eliminate the need for physical payment kiosks." *E.g.,* Exhibit 8, ¶12 (Decl. of Saad Bedros, PhD.).

130. Declaration evidence in the reexamination files of parent patents to the '734 patent also states that with the inventions, "touchless payment options can be provided that enable mobile, app-less payments (via QR codes and digital wallets), which can eliminate the need for physical payment kiosks" and that "[c]ombining touchless payments with remote enforcement reduces congestion and enhances the experience of persons using MPS's parking systems." Exhibit 11, ¶ 7.

131. At the time of invention of the '734 patent, it was counterintuitive to address the problem of effective enforcement and revenue collection by eliminating kiosks from parking facilities.

132. The '734 patent explains that the claimed methods allow for provision of a grace period while at the same time providing a technical solution to the loitering problem in the parking industry.

133. By teaching and claiming novel combinations of capturing entry and exit image data of the vehicle entering the parking facility, transmission of the image data to a remote networked computer, determining the identification of the vehicle entering the parking facility, recording a time of entry for the vehicle, determining whether a parking violation has occurred, and automatically generating violation notices populated with information such as vehicle license plate characters, time of entry, and an image of the vehicle, the claimed techniques allow

for provision of a grace period while at the same time providing a technical solution to the loitering problem in the parking industry.

134. The asserted independent claim in the '734 patent includes the limitations in the previous paragraph. Using this specific type of information, the remote networked computer system may determine that a violation, for example, based on a vehicle loitering longer than a grace period, has occurred even before the vehicle leaves the facility.  In addition, dependent claim 21 is directed to grace period enforcement.  *See* Exhibit 1, claim 21.

135. Declaration testimony from a parking industry expert in reexamination files of parent patents to the '734 patent states that "[m]onitoring individual parking spaces also fails to indicate when a vehicle enters or leaves the parking lot in which the monitored parking space is located. This is important in several respects. For example, it is common for parking lots near bus/train stations and shopping malls for a vehicle to enter a parking lot and loiter in the lot while waiting to pick up a person exiting the station or mall without entering any of the parking spaces. These loitering vehicles clog up travel lanes and create safety hazards within the lot. If the parking management system were monitoring individual parking spaces, then the management system would be unaware of the dangerous vehicle loitering activity." *E.g.,* Exhibit 8, ¶17 (Decl. of Saad Bedros, PhD.).

136. The '734 patent states that "[a] wide variety of payment alternatives and pricing features can be included in certain embodiments, including flexible grace periods." Exhibit 1, 3:66-4:1.

137. The '734 patent states that "[t]his embodiment of the invention provides an unattended, automated parking lot and on street management, with no meters, optionally no

kiosk, and much less hassle to the consumer, while fully automating the violation process for parkers who do not pay, or stay beyond what they have paid for." Exhibit 1, 24:29-34.

138.   The '734 patent states that "[i]f the vehicle had not been registered at the kiosk 512 at all by the owner and was illegitimately parking, a violation status is set, thereby automatically triggering a fine and a notice to enforcement authorities." Exhibit 1, 24:4-7.

139.   The '734 patent also explains that the claimed methods allow for generation of reports on parking trends specific to each parking lot, monitoring multiple lots from a remote location, and remote setting and managing of rules applicable to each lot.

140.   By teaching and claiming novel combinations of capturing entry and exit image data of the vehicle entering and exiting a particular parking facility, transmitting the image data to a remote networked computer, determining the identification of the vehicle entering and exiting that parking facility, recording a time of entry and exit for the vehicle, determining that a parking violation has occurred, and automatically generating violation notices populated with information such as vehicle license plate characters, time of entry, and an image of the vehicle, the claimed techniques allow for generation of reports on trends specific to each parking lot, monitoring multiple lots from a remote location, and remote setting and managing of rules applicable to each lot.

141.   The asserted independent claim of the '734 patent includes the limitations in the previous paragraph. In addition, the preamble of independent claims 1 and 14 each recite that the parking facility has one or more parking rules and that parking violations are determined by non-compliance with the one or more parking rules. *See* Exhibit 1, claims 1, 14.  All of the resulting data can be recorded, tracked, and reported by the remote networked computer system.

142.   The '734 patent states:

> The control computer can also be configured to generate a variety of reports to the owner/operator for any one or more meter for a given time period. For example, monthly revenue can be summarized on a per-meter basis for all meters in a given municipality. Because every transaction is reported and stored in the control computer, the data and reports can be generated without querying the meter. Also, the meter thus does not have to maintain much or any transaction data, which reduces cost of the meter because memory size can be minimized, and also makes the system more secure and robust because the data is centrally stored.

Exhibit 1, 21:45-55.

143. The '734 patent also states "operators are provided with the ability to change many of the operating parameters of any one or more meters, including the fees, schedules, passcodes, grace periods, maximum time, and permitted cards. Each meter's settings can be accessed through a control screen accessible to the owner/operator via the control computer." Exhibit 1, 20:64-21:2.

144. The '734 patent states that "Parking parameters can also be set and updated by a remote computer system networked to the parking meter." Exhibit 1, 3:32-33.

145. The '734 patent states that "[t]his ability to designate multiple different class rules for parking authorization, parking parameters (e.g., grace period length and maximum parking time), corresponding rates (e.g., general, free and discount, etc.), corresponding fine rates, and even geographically customize certain privileges for individual vehicles is not possible with conventional parking meters and permitting schemes." Exhibit 1, 17:60-67.

146. The '734 patent also states that "[a]ny of the meter features of the previous embodiments can also be incorporated into or used in conjunction with the kiosks of the present embodiment. Therefore those features will not be repeated again." Exhibit 1, 23:12-15.

30

**B.    Additional Real-World Evidence**

147.    There is also substantial additional real-world evidence that the invention of the '734 patent was a significant technological advancement and solved specific technical problems in the parking industry.

*PRRS and Asura Technologies*

148.    On information and belief, a company called Asura Technologies has a "partnership" with defendant PRRS.

149.    Asura Technologies' website explains that "while history is rife with attempts to create comprehensive parking compliance systems, **many encountered unforeseen challenges.**" https://asuratechnologies.com/parking/ (emphasis added).

150.    As explained above and below herein, MPS's inventions solved technical problems in the parking industry, and the MPS '734 patent covers methods MPS invented to solve these challenges.

151.    As explained above and below herein, defendant PRRS then took MPS's inventions and used them without authorization and without license in PRRS's infringing systems/services.

152.    Asura Technologies' website describes infringing ARC systems/services that adopted the parking monitoring and management technology MPS invented.

153.    Asura Technologies describes ARC systems/services as a "parking compliance" technology that provides "a seamless journey", with "camera sensors" that provide a "Lot Entry Event," a "Grace Period," and an "Exit Event".

154.    Asura Technologies posted the below graphic on its website:

31



https://asuratechnologies.com/parking/.

155.     A March 11, 2024 online article in Cities Today ("Cities Today") quotes the CEO of Asura Technologies describing the ARC systems/services as follows:

> [W]e install a camera system, typically placing moderately priced cameras on poles around 3-3.5 meters high, on which our artificial intelligence-based software runs. This software synchronously monitors and analyses images captured from multiple angles, reads licence [*sic*] plates, tracks vehicles, and establishes the logic for decision-making. Subsequently, connected to a state vehicle database, it retrieves owner information based on this data and issues fines to those who have not paid parking fees.

https://cities-today.com/industry/reshaping-parking-compliance-through-technology/.

156.     Cities Today describes the ARC systems/services as an approach that "revolutionise[s] parking operations."  https://cities-today.com/industry/reshaping-parking-compliance-through-technology/.

157.     Cities Today describes the ARC systems/services as an approach that "signifies a paradigm shift in parking enforcement and compliance."  https://cities-today.com/industry/reshaping-parking-compliance-through-technology/.

158.     Cities Today states that the ARC system includes "Automated Notice Generation" and provides "Increased Revenue" and that there is a "surging demand for ARC's capabilities." https://cities-today.com/industry/reshaping-parking-compliance-through-technology/.

***Clancy Industries, Inc.***

32

159.   Clancy Industries, Inc. ("Clancy") is another one of MPS's competitors in the parking industry.

160.   In 2020, long after MPS's invention of the '734 patent, Clancy claimed to have independently invented a method that is within the scope of, and thus covered by, claims of MPS patents.

161.   Under the Manual of Patent Examining Procedure, when examining claims of a utility application USPTO patent examiners are required to examine each claim for compliance with 35 U.S.C. § 101, which addresses patent-eligible subject matter. MPEP § 2103 ("Determine whether the claimed invention complies with 35 U.S.C. § 101"); MPEP 2106. This involves determining if the claimed invention falls within the categories of inventions eligible for patent protection.

162.   After examining Clancy's claims, the USPTO did not reject Clancy's claims under 35 U.S.C. § 101.

163.   That the USPTO did not reject Clancy's claims under 35 U.S.C. § 101 means the USPTO determined that Clancy's claims were directed to eligible subject matter.

164.   The USPTO rejected Clancy's claims as obvious in view of a patent application from the MPS family of patents.

165.   Specifically, on December 3, 2020, Clancy, with another subsidiary affiliated with Clancy's CEO, Mr. Stanley Wolfson, filed a patent application with the U.S. Patent & Trademark Office, U.S. Application 2020/0180740 entitled "Camera Parking Enforcement" (the "Clancy Application").

166.   The Clancy Application sought a patent for the following method:

**13**. A method of camera parking enforcement, comprising:

recording, by an intelligent network of cameras, a vehicle entering a designated parking area, and the vehicle leaving the designated parking area;

receiving, by an enforcement computing device, a first signal from the intelligent network of cameras indicating the vehicle entering the designated parking area;

receiving, by the enforcement computing device, a second signal from the intelligent network of cameras indicating the vehicle leaving the designated parking area;

receiving, by the enforcement computing device, a third signal from at least one payment processor;

determining, by the enforcement computing device, a lot time based on the vehicle being in the designated parking area;

comparing, by the enforcement computing device, the lot time to a payment confirmed by the at least one payment processor;

issuing, by the enforcement computing device, a notice of violation for the vehicle when the vehicle remains in the designated parking area for longer than an allowed time based on the payment confirmed by the at least one payment processor.

**14**. The method of claim **13**, further comprising providing a buffer time so that the vehicle can enter and exit the designated parking area without requiring payment.

167.    During prosecution of the Clancy Application, the Examiner rejected the Clancy Application citing one of MPS's patent applications at that time (Hudson et al., U.S. Patent Publication 2014/0214499):

Application/Control Number: 17/247,201                                          Page 3
Art Unit: 2689

6.      Claims 1-20 are rejected under 35 U.S.C. 103 as being unpatentable over Hudson et al.

[U.S. Patent Publication 2014/0214499] in view of Sun et al. [U.S. Patent Publication

2021/0224769]

With regard to claim 1, Hudson et al. meets the limitations of:

- a system for camera parking enforcement comprising an intelligent network of cameras

  including at least one camera to record a vehicle entering a designated parking area, and

  at least one camera to record the vehicle leaving the designated parking area [the use of

  cameras to detect when a vehicle enters a parking spot, parks, and leaves the parking spot

  (paragraph 0041 and figure 16, items 402, 410, and 412)]

168.    Hudson et al. is a patent application filed by MPS.

169.    The Clancy Application was never granted and was ultimately abandoned.

### *Other Parking Industry Sources*

170.    Various parking industry companies and publications have recognized that "gateless" and/or "touchless" parking, which was enabled by MPS's invention of the '734 patent, was an "innovative" approach that is "revolutionizing" the industry.

171.    In 2023, Pave Mobility explained that "[w]hile gateless parking may **sound counterintuitive**, it can actually enhance security" and that "gateless parking offers numerous benefits that are changing the landscape of parking in our modern world." https://pavemobility.com/2023/10/13/the-future-of-parking-exploring-the-benefits-of-gateless-parking/ (emphasis added).

172.    In 2023 Pave Mobility also explained that "traditional parking facilities with entrance and exit gates are gradually giving way to gateless parking systems. Gateless parking, often referred to as 'touchless parking' or 'frictionless parking,' offers a range of benefits that can **revolutionize the parking experience** for both operators and customers." https://pavemobility.com/2023/10/13/the-future-of-parking-exploring-the-benefits-of-gateless-parking/ (emphasis added).

173.    An article on the website of Premium Parking with a date of October 11, 2024, states that "License Plate Recognition (LPR) cameras were installed to use Premium's GLIDE Eye LPR®. These cameras detect those who chose to not pay for their parking session and send invoice through the mail, ensuring that all parkers comply, and revenue can be collected." The article further states that "Transactions and **revenue increased substantially** since Premium went live in late February 2024. Each subsequent month **saw double digit percentage increases**, peaking in May with a 47% percent increase in transactions and 63% increase in

revenue. With the help of Premium's gateless solution, visitors and workers benefit from a seamless parking operation, while the owners continue to experience growth." https://www.premiumparking.com/blog/article/enhanced-enforcement-and-signage-drives-revenue-in-bustling-chicago (emphasis added).

174.    Parking industry website https://gatelessparking.com/ ("Gateless Parking") describes automatically generating violation notices as "**THE. BIG. DEAL**." https://gatelessparking.com/ecosystem (emphasis added). Gateless Parking explains that its system "will automatically generate notices for non-payment the next business day." *Id*.

175.    Gateless Parking also states that gateless lots allow one to "[a]void the pains of installing and maintaining physically barriers in locations that are not ideal for this type of operation" and that "[u]tilizing our gateless features streamlines the experience for the parking public." https://gatelessparking.com/.

176.    Gateless Parking also states "Ever have your parking lot jammed by a parker who just can't get themselves parked? yeah, us too. With no gates on your surface lot the egress is no problem for your customers, they just drive and go."  https://gatelessparking.com/ecosystem.

177.    A parking industry blog states that "[g]ateless parking, also known as 'touchless' or 'frictionless' parking . . . offer[s] a seamless parking experience" and is an "**innovative approach** [that] eliminates the need for entrance and exit gates, enhancing efficiency and convenience for both operators and customers." https://parkingmanagementhub.com/blog/future-of-parking-gateless-technology (emphasis added).

178.    OperationsCommander describes the drawbacks of "traditional parking gates" which "create bottlenecks," and require "both a capital cost and an ongoing maintenance obligation," and explains that gateless facilities "improves the parker experience while

maintaining enforcement visibility and security coverage."

https://operationscommander.com/parking-security-platform/license-plate-recognition/.

179.    A 2023 blog post from Allerin states that "The **Future of Parking** is Gateless."

https://www.allerin.com/blog/the-future-of-parking-is-gateless**/** (emphasis added).

### OVERVIEW OF DEFENDANTS' INFINGEMENT

180.    Upon information and belief PRRS (and/or alternatively PRRS's customers) has directly infringed claims of the '734 patent, literally or via the doctrine of equivalents, by performing methods of parking monitoring and managing that are protected by the '734 patent at various parking facilities throughout the United States including in this District.

181.    For example, on information and belief PRRS provides an "Automated Recognition and Compliance System" ("ARC" system) to automatically capture image data of a vehicle entering and exiting a parking facility, identify and record the time of a vehicle entering and exiting, determine whether a parking violation has occurred, and automatically generate a parking violation notice.

182.    Although some of the evidence and examples shown herein were generated prior to the issuance of the '734 patent, upon information and belief, Defendants continue to operate their systems as described herein, have not altered their practices in a material way, are infringing the '734 patent as of July 21, 2026, and will continue to infringe if not enjoined.

183.    A PRRS webpage stated that ARC" stands for "Automated Recognition and Compliance System, ARC for short."  Previously available at

https://prrsparking.com/complianceprograms.html.

184.    Upon information and belief, such ARC system/services infringe MPS's inventions as defined by one or more claims of the '734 patent, as alleged herein, including as

alleged in the attached Exhibit 6 which are incorporated herein by reference.

185.    PRRS also refers to its ARC systems/services as "compliance monitoring" for parking facilities, and PRRS explains that such monitoring allows for "24/7 monitoring of the transportation facilities." https://prrsparking.com/services/.

186.    Upon information and belief, PRRS's has provided and continues to provide, including via its ARC system/services, "parking lot monitoring" via "fixed LPR [license plate recognition]" as well as "[violation] notice and data management".

187.    PRRS provided the below information on one of its webpages:

PRRS ensures superior performance from existing assets owned and operated by an operator by monitoring the usage of an asset or area to ensure compliance with the operator's terms of service, operating rules, access authorizations and fee schedules.

## THE 5 FOUNDATIONS
## OF OUR COMPLIANCE PROGRAM

    

Previously available at https://prrsparking.com/services.html.

188.    Upon information and belief PRRS has provided and continues to provide its automated parking monitoring and management systems/services to parking facility operators, including, without limitation, LAZ Parking, including under the "ARC" name.

189.    For example, a PRRS webpage explained that it provides "monitoring" of parking lots using its "automated ARC System" to "identify exceptions to [lot operators'] rules and terms of service" and "ensure that exceptions are identified and documented efficiently." Previously available at https://prrsparking.com/services.html#serviceDetails.

190.    For example, a PRRS webpage explained that PRRS provides "notice and data

management," via "software [that] automates the enforcement and management process in one holistic solution to streamline notice issuance and processing." Previously available at https://prrsparking.com/services.html#serviceDetails.

191.   Upon information and belief, use of PRRS's ARC system/services has included and continues to include "register[ing]" a vehicle "upon entry and exit using ALPR," "record[ing]" the "parking event…in the database," checking for "[p]ayment confirmation," and "retriev[ing] vehicle owner data and issu[ing] notices for operating rules exceptions".

192.   A PRRS webpage provided the below information:



Previously available at https://prrsparking.com/complianceprograms.html#complianceDetails.

193.   Upon information and belief, the "ALPR" referenced on PRRS's website refers to "Automated License Plate Recognition."

194.   Upon information and belief, PRRS's ALPR uses cameras to capture images of vehicle license plates as they enter and exit a parking facility and then employs optical character recognition ("OCR") technology to convert the images into text, which the system then compares against databases of license plate registrations and is used by the system to issue a parking

violation notice, for example if a certain time period had expired without payment.

195.    Upon information and belief, PRRS posted a promotional video regarding its "ARC" system on YouTube, at the following URL: https://www.youtube.com/watch?v=SOOz-6riR2c.

196.    Below is a true and correct copy of a screenshot from the video at the URL https://www.youtube.com/watch?v=SOOz-6riR2c, at the 1:55 mark:



197.    Upon information and belief, PRRS's ARC system/services have and continue to automatically issue parking violation notices in the event the system detects that a vehicle that entered and exited the parking facility did not pay for parking within a certain grace period.

198.    Upon information and belief, PRRS posted a video at the following URL that also explains its "ARC" system: https://www.facebook.com/Parkingprrs/videos/768476596907647.

199.    The video posted at https://www.facebook.com/Parkingprrs/videos/768476596907647 states:

> "The license plate recognition camera, grabs the license plate image of the customer captures the time that they entered the lot. It gives them a 10 minute grace period to walk to the pay station and pay the pay station. If they don't pay and they don't meet that 10 minute grace period and they remain on the lot when they exit the lot. It'll capture their exit time and then that information will be

sent to our screamer program, PRRS's enforcement system, and it'll send a letter to that person within one to two business days of a violation that they were either over time or they didn't pay the parking fee for the day."

200.    Upon information and belief, the individual shown and featured in the video posted at https://www.facebook.com/Parkingprrs/videos/768476596907647 is PRRS's CEO John Conway.

201.    Upon information and belief, PRRS also has provided and continues to provide customers and potential customers with documents describing PRRS's infringing system/services, including the "ARC" system/services.

202.    Exhibit 13 is a true and correct copy of a PRRS document provided to PRRS customers or potential customers describing PRRS's ARC system/services.

203.    Exhibit 13 provides the following depiction of PRRS's "ARC Frictionless Compliance" system:



PRRS takes parking facility monitoring to the next level with its 24/7 automatic, gate- and barrierless solution. Lot monitoring is automated by installing cameras at the access points of the parking lot to capture each entry and exit event. Parking event payment information is retrieved from onsite payment terminals, contract management software, reservation platforms, and other digital payment solutions to confirm authorization and payment to the facility.

**FEATURES:**

- Vehicles are identified at entry and exit using ALPR.
- Payment is confirmed based on license plate by querying appropriate payment solutions.
- Operating exceptions are identified and include appropriate event details which are provided to the parking operator.
- Parking sessions and occupancy are monitored real-time.



Exhibit 13, at 7, previously available at

https://prrsparking.com/complianceprograms.html#complianceDetails.

204.    Upon information and belief, PRRS has provided and continues to provide this system/services to customers, including to Defendant LAZ Parking.

205.    A PRRS website provided the following information:



Previously available at https://prrsparking.com/complianceprograms.html.

206.    Upon information and belief, one example of infringing automated parking monitoring and management systems/services PRRS has provided and continues to provide to its customers is called "ARC360." *See* https://asuratechnologies.com/2022/01/10/its-official-gb-partners-and-asura-technologies-own-the-majority-share-in-prrs/ ("**ARC360**, a product expansion option, is a collection of services that cover the full spectrum of parking enforcement, citation management, and collection services.").

207.    Upon information and belief, PRRS's "ARC360" has included and continues to include use of PRRS's "Frictionless Compliance" system.

208.    Upon information and belief, another example of infringing automated parking monitoring and management systems/services PRRS has provided and continues to provide to its customers is called "ARC135."

209.    Upon information and belief, PRRS's "ARC135" has included and continues to include use of PRRS's "Frictionless Compliance" system.

210.    Upon information and belief, another example of infringing automated parking monitoring and management systems/services PRRS has provided and continues to provide to its customers under the "Paralign" name, including the "Autostart" system/services.

43

211.    Upon information and belief, PRRS provided a press release that is shown at

https://www.parking-mobility.org/news/prrs-launches-autostart/, a true and correct excerpt of

which is below:



212.    The news release located at https://www.parking-mobility.org/news/prrs-

launches-autostart/ states that "Autostart offers an open network, precise payment activation for

gateless, free-flow parking facilities, capturing and verifying license plate data the instant a

vehicle enters and exits a facility and automatically charging drivers." https://paralign.co/add-

ons/autostart/.

213.    A website under the "Paralign" name is linked to this news release and describes

Autostart as "an add-on feature that enables camera-only parking – no barriers, no ticket

machines, no app required at the point of entry." https://paralign.co/add-ons/autostart/.

214. Upon information and belief, the "Paralign" website is owned and controlled by PRRS.

215. Upon information and belief, the services/systems offered under the "Paralign" name are provided and controlled by PRRS.

216. Upon information and belief, PRRS provided and caused to be published a press release entitled "PRRS Launches Autostart," which states that "PRRS, the leading provider of parking compliance solutions, announced the introduction of Autostart." https://www.parking-mobility.org/news/prrs-launches-autostart/.

217. PRRS also describes Paralign as "[o]ur tech partner" on its website. https://prrsparking.com/services/.

218. Upon information and belief, PRRS's ARC system/services, including but not limited to use of the ARC "Frictionless Compliance" system, and including but not limited to ARC360, ARC135, and Autostart results in PRRS performing all of the claimed steps and therefore directly infringing at least claim 1 of the '734 patent the United States, the State of Texas, and this District, as alleged above and further below and also as shown in the attached Exhibit 6, which are incorporated as if fully set forth herein.

219. On information and belief, LAZ Parking has contracted for PRRS's automated parking monitoring and management systems/services at parking lots operated by LAZ Parking, including at lots in Austin, Texas as alleged above, and on information and belief such systems/services include use of PRRS's "ARC" system/services, including the "Frictionless Compliance" system.

220. On information and belief, the PRRS "ARC" systems/services used at LAZ Parking-operated parking lots, including LAZ Parking-operated parking lots in Austin, Texas,

45

infringes at least claim 1 of the '734 patent the United States, the State of Texas, and this District, as alleged herein and in the attached Exhibit 6.

221.    By contracting with PRRS for the infringing systems/services at LAZ Parking operated parking lots, upon information and belief LAZ Parking has induced infringement of the '734 patent the United States, the State of Texas, and this District, as alleged above and further below.

222.    In the alternative, to the extent some automated parking monitoring and management systems/services provided by PRRS require that the claimed steps are performed by a combination of PRRS and its customer, on information and belief and as also alleged below the performance of one or more of the claimed steps by a PRRS's customer is attributable to PRRS, or alternatively the performance of one or more infringing steps by PRRS is attributable to PRRS's customer under the theory of joint infringement as also alleged further below, at least by virtue of the contract between PRRS and its customer. In this instance, the combination of PRRS and its customer perform all of the claimed steps of the asserted claim of the '734 patent, as alleged herein and as shown in Exhibit 6, which are incorporated here by reference.

223.    In the alternative, PRRS is indirectly infringing the '734 patent by actively inducing and/or contributing to the direct infringement by others of the '734 patent in the United States, the State of Texas, and this District, PRRS and is liable for infringement under 35 U.S.C. §§ 271(b) and/or (c).

## DEFENDANTS' KNOWLEDGE OF THE '734 PATENT

224.    Upon information and belief, Defendants knew about the '734 patent at least as of the date of the filing of this Complaint.

225.    MPS has complied with the marking and notice requirements of 35 U.S.C. § 287.

226.    The '734 patent is part of the same patent family as U.S. Pat. No. 10,121,172 (the "'172 patent"), the '302 patent, the '205 patent, the '085 patent, and the '187 patent, which are asserted against Defendants in another currently stayed lawsuit pending in this District. Upon information and belief, Defendants have been monitoring the application that resulted in the '734 patent and were aware prior to the filing of this Complaint that the U.S. Patent Office had allowed the claims of the '734 patent.

227.    On information and belief, and as alleged above, Defendants have known of the existence of the '734 patent and its applicability to PRRS's automated parking monitoring and management systems/services, and Defendants' acts of infringement have been and will continue to be willful and in disregard for the '734 patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct, at least as of filing date of this Complaint.

## COUNT 1
### Infringement of U.S. Patent No. 12,688,734

228.    MPS incorporates the paragraphs above as if fully set forth herein.

229.    MPS is the assignee of all right, title and interest in the '734 patent, a copy of which is attached as Exhibit 1.

230.    Upon information and belief, PRRS has infringed claims of the '734 patent, directly or indirectly, by making, using, offering to sell, selling, and/or importing automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, for and/or at parking facilities of its customers throughout the United States, including parking facilities of customers located in this District.

231.    Upon information and belief, PRRS has directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, claims of the '734 patent by making, using, offering to sell, selling, and/or importing automated

parking monitoring and management systems/services, including but not limited to, using such systems/services at parking facilities located in this District.

232.   Upon information and belief, such infringement includes PRRS's ARC system/services. For example, upon information and belief, PRRS deploys its "ARC" system/services at parking facilities of PRRS's customers, and in so doing PRRS performs each step of claim 1 of the '734 patent and therefore infringes at least that claim. A comparison of claim 1 of the '734 patent to PRRS's ARC system/services is attached as Exhibit 6, which is incorporated herein by reference.

233.   In the alternative, PRRS is liable for direct infringement under the theory of joint infringement. Upon information and belief, the automated parking monitoring and management systems/services provided by PRRS to its customers (including the ARC system/services) require at least that some combination of PRRS and its customer use such system/services and perform all the steps recited by claims of the '734 patent, including at least claim 1. Further, upon information and belief, to the extent such system/services provided by PRRS involves PRRS's customer performing some of the claimed steps and PRRS itself performing others, all of the claimed steps are nevertheless attributable to PRRS under the theory of joint infringement due to a contractual relationship between PRRS and its customer where PRRS directs its customer to perform the claimed steps that PRRS itself does not perform.

234.   Upon information and belief, PRRS also provides its customers with detailed instructions regarding how to perform the claimed steps, and resources for helping them to do so.

235.   In addition, upon information and belief PRRS contracts with its customers to condition receipt of the benefit of its automated parking monitoring and management systems/services on those customers' performance of any steps of using such systems/services

48

that PRRS itself does not perform, according to terms prescribed by PRRS as part of its contract with the customer.

236.    Upon information and belief PRRS also maintains control over the use by its customers of the systems providing the parking monitoring, including the ARC system/services. For example, the "Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS's website at https://prrsparking.com/legal.html, states PRRS's customers' "use of the ARC Software will be solely in accordance with the documentation [provided by PRRS], this Agreement, and such reasonable instructions as PRRS may provide from time to time." Exhibit 14, p.1.

237.    Exhibit 14 is a true and correct copy of the "Facility Monitoring and Compliance Agreement Terms and Conditions" that is posted on PRRS's website at https://prrsparking.com/legal.html.

238.    In the alternative, PRRS is indirectly infringing the '734 patent by actively inducing and/or contributing to the direct infringement by PRRS's customers of the '734 patent in the United States, the State of Texas, and this District.

239.    Upon information and belief, PRRS knew of the '734 patent at least as of the filing of the Complaint as alleged above.

240.    Upon information and belief and as alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and/or have been in use at parking lots operated by PRRS customers, infringe claims of the '734 patent, including claim 1.

241.    In the alternative, upon information and belief, PRRS is now in violation of 35 U.S.C. § 271(b) by knowingly and intentionally inducing infringement of claims of the '734

patent, including at least claim 1. Upon information and belief, PRRS specifically intended and was aware, and continues to intend and be aware, that the ordinary and customary use of its automated parking monitoring and management systems/services, including the ARC system/services, by its customers would infringe the '734 patent.

242.    Upon information and belief, PRRS took active steps, and continues to take active steps, to encourage its customers to use and operate PRRS's automated parking monitoring and management systems/services at parking facilities of PRRS customers, despite knowing of the '734 patent, in a manner PRRS knew to directly infringe claims of the '734 patent, including at least claim 1. Further, upon information and belief PRRS provides product and/or service manuals and other technical information that cause its customers and/or other third parties to use and to operate the ARC system, for its ordinary and customary use, such that PRRS's customers and/or other third parties have directly infringed the '734 patent, through the normal and customary use of PRRS's ARC system/services. For example, see Exhibit 14, p.1 ("Facility Monitoring and Compliance Agreement Terms and Conditions" posted on PRRS's website, stating that PRRS provides "ARC Software modules and related documentation" to its customers). Upon information and belief, such software and/or documentation instructs PRRS's customers to perform method(s) that infringe at least claim 1 of the '734 patent.

243.    Upon information and belief, PRRS's encouragement of its customers to use the ARC system/services according to its ordinary and customary usage resulted in, and continues to result in, PRRS's customers directly infringing claims of the '734 patent, including at least claim 1.

244.    In the alternative, PRRS also is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of claims of the '734 patent, including at least claim 1, literally

and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this District and elsewhere in the United States, automated parking monitoring and management systems/services, including ARC system/services, with knowledge of the '734 patent and knowing that such automated parking monitoring and management systems/services are especially made or especially adapted for use in the infringement of the '734 patent, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

245. Upon information and belief, LAZ Parking is infringing the '734 patent, including by knowingly, actively, and intentionally inducing the direct infringement by others of the '734 patent in the United States, the State of Texas, and this District.

246. For example, upon information and belief LAZ Parking has contracted with PRRS to deploy PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, at parking facilities operated by LAZ Parking located at 510 Guadalupe Street, 108 W. Gibson, 305 S. Congress Avenue, 415 E 7th Street, and 99 Trinity Street in Austin, Texas as well as at additional locations within the United States.

247. As alleged above, PRRS's automated parking monitoring and management systems/services, including PRRS's "ARC" system/services, that are and have been in use at parking lots operated by LAZ Parking, infringe claims of the '734 patent, including at least claim 1. A comparison of claim 1 of the '734 patent to PRRS's ARC system/services is attached as Exhibit 6, which is incorporated herein by reference.

248. Upon information and belief, LAZ Parking knew of the '734 patent no later than the date of filing of this Complaint.

249. Upon information and belief, LAZ Parking specifically intended and was aware, and continues to intend and be aware, that the ordinary and customary use PRRS's "ARC"

system/services at LAZ Parking-operated facilities would infringe the '734 patent, including at least claim 1.

250.    Upon information and belief, LAZ Parking additionally took active steps, and continues to take active steps, to encourage PRRS to use and operate PRRS's ARC system/services at LAZ Parking's facilities, despite knowing of the '734 patent, in a manner LAZ Parking knew to directly infringe claims of the '734 patent, including at least claim 1.

251.    Upon information and belief LAZ Parking knew that the normal and customary use by PRRS of PRRS's ARC system/services at LAZ Parking-operated lots directly infringed the '734 patent.

252.    In the alternative, LAZ Parking is liable for direct infringement, including under the theory of joint infringement.

253.    Upon information and belief, automated parking monitoring and management systems/services provided by PRRS to LAZ Parking, including the ARC system/services, require at least that some combination of PRRS, LAZ Parking, and/or others in contract with LAZ Parking use such systems/services and perform all the steps recited by claims of the '734 patent, including at least claim 1. Further, upon information and belief, to the extent use of such systems/services involves PRRS itself or another LAZ Parking contractee performing one or more of the claimed steps, all of the claimed steps are nevertheless attributable to LAZ Parking under the theory of joint infringement due to a contractual relationship between LAZ Parking and its contractee(s) that directs the contractee (e.g., PRRS) to perform, and also provides instructions regarding how to perform, the claimed steps that LAZ Parking itself does not perform.

254.    In addition, upon information and belief the contract LAZ Parking entered into with PRRS conditions payment for PRRS's automated parking monitoring and management systems/services on PRRS's performance of any steps of the contracted-for ARC system/services that LAZ Parking itself does not perform.

255.    Defendants' infringement of the '734 patent is ongoing.

256.    Defendants' infringement of the '734 patent is and continues to be willful, at least as of the date of each Defendant's knowledge of the '734 patent as alleged above.

257.    Defendants have profited from and will continue to profit from their infringing activities. MPS has been and will continue to be damaged by Defendants' infringing activities. As a result, MPS is entitled to injunctive relief and damages adequate to compensate it for such infringement, in accordance with 35 U.S.C. §§ 271, 281, 283, and 284. The harm to MPS from Defendants' ongoing infringing activity is irreparable, is continuing, is not fully compensable by money damages, and will continue unless Defendants' infringing activities are enjoined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff MPS requests that this Court grant the following relief:

A.    A judgment that Defendants have infringed the '734 patent;

B.    An order restraining and enjoining Defendants, their officers, agents, attorneys and employees, and those acting in privity or concert with Defendants, from further infringing the '734 patent;

C.    A judgment and order requiring Defendants to pay all appropriate damages under 35 U.S.C. § 284, including prejudgment and post-judgment interest and including damages arising from Defendants' continuing infringement up until the date Defendants are finally and permanently enjoined from further infringement;

D.      A determination that Defendants' ongoing infringement of the '734 patent is willful and an award of treble damages to MPS pursuant to 35 U.S.C. § 284;

E.      A judgment and order requiring Defendants to pay MPS's attorney's fees incurred in connection with this lawsuit, if this case is found to be exceptional as provided by 35 U.S.C. § 285;

F.      An order awarding MPS costs and expenses in this action; and

G.      Such other and further relief as the Court may deem just and equitable.

### DEMAND FOR TRIAL BY JURY

Plaintiff MPS demands a trial by jury on all issues that are so triable.

Dated: July 21, 2026                    Respectfully submitted,

/s/ *Deron R. Dacus*
Deron R. Dacus
State Bar No. 00790553
The Dacus Firm, P.C.
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Phone/Fax:  903-705-1117
ddacus@dacusfirm.com

Philip P. Caspers (*Pro Hac Vice forthcoming*)
Samuel A. Hamer (*Pro Hac Vice forthcoming*)
Peter M. Kohlhepp (*Pro Hac Vice forthcoming*)
R. Willes Ely (*Pro Hac Vice forthcoming*)
Carlson, Caspers, Vandenburgh
   & Lindquist P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Phone:  (612) 436-9659
Facsimile: (612) 436-9605
pcaspers@carlsoncaspers.com
shamer@carlsoncaspers.com
pkohlhepp@carlsoncaspers.com
wely@carlsoncaspers.com

54

*Attorneys for Plaintiff Municipal Parking Services, Inc.*

55